**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 19-1953**

HESTER PRYNNE,

       Plaintiff – Appellant,

    v.

COLONEL GARY T. SETTLE, in his official capacity as Superintendent of the Virginia Department of State Police,

       Defendant – Appellee,

    and

GOVERNOR RALPH S. NORTHAM, in his official capacity as Governor of the Commonwealth of Virginia,

       Defendant.

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Claude M. Hilton, Senior District Judge. (1:19-cv-00329-CMH-JFA)

Argued: October 29, 2020              Decided: February 24, 2021

Before GREGORY, Chief Judge, AGEE, Circuit Judge, and Stephanie A. GALLAGHER, United States District Judge for the District of Maryland, sitting by designation.

Reversed and remanded in part, affirmed in part by unpublished opinion. Judge Gallagher wrote the majority opinion, in which Chief Judge Gregory joined. Judge Agee wrote an opinion dissenting in part.

**ARGUED:** Timothy P. Bosson, BOSSON LEGAL GROUP PC, Fairfax, Virginia, for Appellant. Michelle Shane Kallen, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellee. **ON BRIEF:** Mark R. Herring, Attorney General, Victoria N. Pearson, Deputy Attorney General, Samuel T. Towell, Deputy Attorney General, Toby J. Heytens, Solicitor General, Martine E. Cicconi, Deputy Solicitor General, Jessica Merry Samuels, Assistant Solicitor General, Zachary R. Glubiak, John Marshall Fellow, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

GALLAGHER, District Judge:

Plaintiff-Appellant Hester Prynne[1] ("Prynne") appeals from a district court order dismissing her claim that the Virginia Sex Offender and Crimes Against Minors Registry ("VSOR") violates the Ex Post Facto Clause of the Constitution and the Due Process Clause of the Fourteenth Amendment. Because Prynne's complaint pleaded a plausible ex post facto claim, we reverse the district court's dismissal of that claim. However, we affirm the dismissal of Prynne's substantive due process claims.

I.

In 1994, Prynne pleaded guilty to one count of taking indecent liberties with a child in a custodial supervisory relationship, in violation of Virginia Code § 18.2-370.1. J.A. 10–11. While in her twenties, Prynne "had sex one time with a 15-year old male in the home where she served as a nanny." J.A. 10. The court imposed a suspended three-year sentence with four years of probation. *Id.* No sex offender registry existed in Virginia at the time.

A few months after Prynne's conviction, Virginia enacted VSOR, imposing registration requirements on all persons "under community supervision on July 1, 1994" for specified offenses, including violations of § 18.2-370.1. J.A. 10–11. The initial law required Prynne to register for fifteen years. Three years later, in 1997, Virginia amended VSOR, prohibiting registrants from petitioning for removal during the first ten years of their registration. J.A. 11. Because Prynne first registered in 1995, she was prohibited

---

[1] Hester Prynne is a pseudonym approved by the district court. J.A. 181.

from petitioning for removal from the registry until 2005. *Id.* In 2001, however, Virginia again amended VSOR, categorizing Prynne's conviction as a "sexually violent" offense, and prohibiting registrants convicted of such offenses from ever petitioning for removal throughout their lifetimes. J.A. 11. Thus, Prynne is required to remain on the registry for the rest of her life, with no hope of removal, and she is forever categorized on the public registry as the most dangerous kind of offender.[2]

Upon initial registration, offenders must provide a host of personal information, including name, address, photograph, work or school address, vehicle registration, email addresses and other internet aliases, fingerprints, and a DNA sample. J.A. 14–15; Va. Code Ann. §§ 9.1-903, 9.1-913. Currently, Prynne is required to reregister every three months.[3] J.A. 16; Va. Code. Ann. § 9.1-904. She also must appear in person to be photographed at least every two years and must submit a new set of fingerprints every ninety days. J.A. 16. Additionally, she must expediently report any changes to her registry information,

---

[2] Previously, Prynne's entry on the registry included the designation, "Violent: Yes," based on the categorization of her conviction. J.A. 12 n.2. Since this lawsuit was initially filed, as Prynne admitted at oral argument, registrants like Prynne, whose convictions were previously labeled as "sexually violent," are now labeled as "Tier III." Va. Code Ann. § 9.1-911.

[3] Registrants, like Prynne, may petition to have the reregistration requirement reduced to once a year. To do so, she must submit to "a comprehensive assessment . . . by a panel of three certified sex offender treatment providers" and show by "clear and convincing evidence" that she "does not suffer from a mental abnormality or personality disorder that makes the person a menace to the health and safety of others or significantly impairs [her] ability to control [her] sexual behaviors." Va. Code Ann. § 9.1-909.

4

including notifying authorities within three days of a change of address and within thirty minutes of creating a new email address. J.A. 15; Va. Code Ann. § 9.1-903.

Updates to and verification of registry data must often be done in person. Prynne must report to a sex offender investigative officer who is permanently assigned to her case. This assigned officer is responsible for verifying Prynne's registry information and is permitted to visit her residence without notice. J.A. 16.

Additionally, due to her status as a registrant, Prynne is prohibited from entering any school grounds, school buses, or day care facilities during "school-related or school-sponsored activities." Va. Code Ann. § 18.2-370.5(A). She is also prohibited from adopting a child, § 63.2-1205.1, and from working in certain fields including childcare, and driving for a rideshare or tow truck service, §§ 46.2-2099.49; 46.2-116. J.A. 19.

Prynne also must comply with additional requirements to travel. She must notify the Virginia State Police ten days prior to moving her residence outside of Virginia. Va. Code Ann. § 9.1-903. When traveling internationally, she must notify federal and international law enforcement agencies, and may be barred from entering other countries altogether. Travel to other states may also trigger a requirement to register on those states' sex offender registries, sometimes even for relatively short stays. J.A. 18; *e.g.*, Fla. Stat. § 943.0435 (requiring registration within forty-eight hours); Alaska Stat. § 12.63.010 (requiring registration on the "next working day" after arrival).

Prynne alleges that VSOR and associated laws have "restricted every aspect of [her] life." Appellant's Br. 6. She has been asked to move out of a rental property by one landlord and has been turned down by other potential landlords after they discovered her

5

registry status. J.A. 20. Though she has acted as "a mother figure" to her husband's youngest daughter from a previous marriage, Prynne has been unable to attend her stepdaughter's school functions. *Id.* She also decided not to have her own children, out of fear they would be taken away from her due to her status as a registered sex offender. *Id.* at 21. Because many churches operate day cares or Sunday schools, Prynne alleges that she has been limited in which church she is able to attend. *Id.* Prynne also claims she was fired from her job at an accounting firm because of her placement on the registry and lost another job opportunity when a potential employer discovered she was a registered sex offender. *Id.* at 21–22. Moreover, she has been "a victim of vigilantism," harassed and "shamed" by neighbors who discovered her registry status. *Id.* at 22.

Prynne alleges the registry does not actually serve "any non-punitive purpose." *Id.* at 20. She asserts the registry "has no discernible positive effect on recidivism," and argues empirical evidence indicates that registries like VSOR may actually "exacerbate recidivism." *Id.*

Prynne's complaint alleges three claims: (1) VSOR violates the Ex Post Facto Clause, (2) VSOR violates the Due Process Clause of the Fourteenth Amendment, and (3) VSOR violates the Ex Post Facto Clause of the Virginia Constitution. J.A. 26–30. Defendants filed a Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). The district court granted the motion, finding Prynne failed to state a claim under either federal constitutional provision and declining to exercise supplemental jurisdiction over the state law claim. J.A. 215. Prynne subsequently appealed.

We review a district court's grant of a motion to dismiss de novo. *Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020). Federal Rule of Civil Procedure 12(b)(6) permits a defendant to test the legal sufficiency of a complaint by way of a motion to dismiss. *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165–66 (4th Cir. 2016); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). To survive a motion under Federal Rule of Civil Procedure 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009); *see also Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017). If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555. Rather, the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Id.* at 556 (internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint" and must "draw all reasonable inferences [from those facts] in favor of the plaintiff." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011); *see Semenova v. Md. Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015); *Kendall v. Balcerzak*, 650 F.3d 515, 522 (4th Cir. 2011). But, a court is not required to accept legal conclusions drawn from the facts. *See Papasan v. Allain*, 478 U.S. 265, 286

(1986). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Soc'y Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011).

III.

The Ex Post Facto Clause prohibits the government from passing any law that retrospectively "inflicts a greater punishment" on a person than that available when a crime was committed. *Calder v. Bull*, 3 U.S. 386, 390 (1798); U.S. Const. art. I, § 9, cl. 3. The Supreme Court has espoused a two-pronged test for determining whether a statute imposes punishment. *Smith v. Doe*, 538 U.S. 84, 92 (2003); *United States v. Wass*, 954 F.3d 184, 189 (4th Cir. 2020). First, a court must determine "[i]f the intention of the legislature was to impose punishment." *Smith*, 538 U.S. at 92. If, instead, the court finds the legislature intended to impose a civil regulatory scheme, the court moves to the second prong of the inquiry, and examines whether the statute is "so punitive either in purpose or effect as to negate [the State's] intention' to deem it 'civil.'" *Id.* (alteration in original) (quoting *Kansas v. Hendricks*, 521 U.S. 346, 361 (1997)). The *Smith* Court identified the factors enumerated in *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168–69 (1963), as providing "a useful framework" to analyze whether a statute has a punitive effect. 538 U.S. at 96 (describing "the *Mendoza-Martinez* factors"). The most relevant factors applicable to examining a sex offender registry statute include:

8

"whether, in its necessary operation, the regulatory scheme:" (1) "has been regarded in our history and traditions as punishment;" (2) "imposes an affirmative disability or restraint;" (3) "promotes the traditional aims of punishment;" (4) "has a rational connection to a nonpunitive purpose;" or (5) "is excessive with respect to this purpose."

*Wass*, 954 F.3d at 193 (quoting *Smith*, 538 U.S. at 105). Although "only the clearest proof" of punitive effect will allow a court to disregard the intent of the legislature, *Smith*, 538 U.S. at 92, Prynne need not definitively prove her case to survive a motion to dismiss. *See Twombly*, 550 U.S. at 547 (explaining plaintiffs must instead "nudge[] their claims across the line from conceivable to plausible"). "Our role in reviewing the grant of a 12(b)(6) motion is merely to determine whether the plaintiff[] stated a plausible claim, such that [she] should be permitted to proceed to discovery." *Doe v. Miami-Dade Cnty.*, 846 F.3d 1180, 1186 (11th Cir. 2017) (reversing dismissal of claim that the Florida sex offender registry violates the Ex Post Facto Clause). Upon reviewing Prynne's complaint, we find she has met that low bar, and can pursue her ex post facto challenge.

A.

As a preliminary matter, for VSOR to violate the Ex Post Facto Clause, it must operate retroactively. It is undisputed that the registry did not exist when Prynne committed the crime and that, nevertheless, many of the requirements and restrictions of VSOR now apply to her. Notably, however, some of the more onerous VSOR restrictions do not apply retroactively and, thus, cannot be the basis of an ex post facto claim. *E.g.*, Va. Code Ann. §§ 18.2-370.2 to 18.2-370.3 (prohibiting certain registrants from residing within 500 feet or loitering within 100 feet of schools and parks). Our analysis proceeds only upon the VSOR provisions that apply retroactively to Prynne.

9

The district court properly found that VSOR was not enacted with the intent of imposing punishment, but of creating a civil regulatory regime. Prynne alleges in her Complaint that "[s]everal aspects of the Registry point to its punitive purpose, including the law's application only to those convicted of crimes, the fact that the state's criminal justice system administers and enforces it, the law's punitive effects . . . , and others." J.A. 22. However, the Supreme Court and this Court have found registries that apply only to previously convicted persons and are administered in part by the courts or law enforcement agencies are nevertheless not intended as punishment. *See Smith*, 538 U.S. at 95–96; *United States v. Under Seal*, 709 F.3d 257, 264 (4th Cir. 2013). Moreover, the Virginia Legislature "expressed the objective of the law in the statutory text itself." *Smith*, 538 U.S. at 93 (finding the statement of purpose of the law persuasive in determining intent). The statute states, "The purpose of [VSOR] shall be to assist the efforts of law-enforcement agencies and others to protect their communities and families from repeat offenders and to protect children . . . ." Va. Code Ann. § 9.1-900. Although protecting the public may also be one purpose of criminal laws, as the Court noted in *Smith*, "where a legislative restriction 'is an incident of the State's power to protect the health and safety of its citizens,' it will be considered 'as evidencing an intent to exercise that regulatory power, and not a purpose to add to the punishment.'" 538 U.S. at 93–94 (quoting *Flemming v. Nestor*, 363 U.S. 603, 616 (1960)). Thus, the text of the VSOR expresses its civil purpose.

Additionally, the bulk of VSOR requirements are found in Title 9.1 of the Virginia Code, which deals with "Commonwealth Public Safety," indicating the legislature's intent

10

to create a civil regime. *See Smith*, 538 U.S. at 94 (finding "the manner of codification . . . probative of the legislature's intent"); *Under Seal*, 709 F.3d at 264 ("While not controlling, the manner in which [the statute] was codified in [the public health and welfare section of the United States Code] is indicative of Congress' intent that [the statute]'s registration provisions are civil in nature."). Some associated provisions are found in Title 18.2, "Crimes and Offenses Generally." *See* Va. Code § 18.2-370.5 (prohibiting registrants from entering schools, school buses, and day cares). Still, "[t]he partial codification of the Act in the State's criminal procedure code is not sufficient to support a conclusion that the legislative intent was punitive." *Smith*, 538 U.S. at 95. Thus, we conclude that VSOR was intended as a civil sanction. Therefore, to state a valid ex post facto claim, Prynne must plausibly allege the statute has a punitive effect that negates this intent.

## C.

This Court has held that the federal Sex Offender Registration and Notification Act ("SORNA") did not have a punitive effect sufficient to violate the Ex Post Facto Clause. *Wass*, 954 F.3d at 193. However, Prynne has identified requirements in VSOR, distinct from SORNA, and has alleged that those additional requirements, and Virginia's statute as a whole, have an exceedingly punitive impact.[4] In the proceeding analysis, we review Prynne's complaint in light of the most relevant *Mendoza-Martinez* factors to determine

---

[4] We recognize that this Court upheld a dismissal of an ex post facto challenge to VSOR in *Ballard v. F.B.I., Chief*. 102 F. App'x 828, 829 (4th Cir. 2004) (per curiam) (unpublished) (finding summarily the "statute does not violate the Ex Post Facto Clause"). That decision, however, is not binding on this or any court.

11

whether she has pleaded a plausible claim.[5]  In doing so, we do not intend to imply how the factors should be weighed at a later stage of the litigation.

First, Prynne alleges the statute's requirements resemble traditional forms of punishment, specifically "shaming, banishment, probation/parole, and others." J.A. 23.  In *Smith* and *Under Seal*, the Court concluded the registry statutes at issue were unlike shaming because the registries simply collected already public information and posted it on a website, and "[o]ur system does not treat dissemination of truthful information in furtherance of a legitimate governmental objective as punishment." *Under Seal*, 709 F.3d at 265 (quoting *Smith*, 538 U.S. at 98).  Prynne, however, argues that in addition to the compilation of otherwise public information, VSOR independently defines and classifies each registrant as a Tier I, II, or III offender.  In Prynne's case, she permanently has a "Tier III" label on her public registry profile, indicating she is the most dangerous type of registrant.  Prynne argues this public marker does not reflect a "truthful" or accurate assessment of the threat she poses to the community.  Additionally, though the *Smith* Court concluded the Alaska registry was not sufficiently akin to parole or probation, Prynne contends VSOR imposes greater, "Orwellian-level" supervision on its registrants.

---

[5] There are two additional *Mendoza-Martinez* factors: "whether the regulation comes into play only on a finding of scienter" and "whether the behavior to which it applies is already a crime." *Wass*, 954 F.3d at 193 n.11 (quoting *Smith*, 538 U.S. at 105).  The parties do not dispute VSOR satisfies these factors.  However, this Court has given them little consideration when analyzing sex offender registry laws because, as the *Smith* Court explained, "The regulatory scheme applies only to past conduct, which was, and is, a crime. This is a necessary beginning point, for recidivism is the statutory concern." *Smith*, 538 U.S. at 105; *see also Wass*, 954 F.3d at n.11 (citing *Under Seal*, 709 F.3d at 264 n.5).

12

Appellant's Br. 15. In addition to a host of reporting requirements, many of which must be done in person, a specific Virginia State Police officer is permanently assigned to Prynne's case. This officer must verify Prynne's registration information by visiting her work and home addresses, without notice, twice a year.[6] Thus, Prynne has identified aspects of VSOR, distinct from other registries reviewed by this Court, and has plausibly alleged their resemblance to traditional forms of punishment.

Second, Prynne alleges VSOR imposes affirmative disabilities and restraints. In *Under Seal*, this Court found SORNA did not subject the appellant registrant to an affirmative disability or restraint because SORNA "does not restrain activities sex offenders may pursue" or require them to "seek permission" before acting. 709 F.3d at 265 (quoting *Smith*, 538 U.S. at 100). Additionally, the Court explained that in-person reporting requirements "may be more inconvenient," but are not punitive restraints. *Id.* (quoting *United States v. W.B.H.*, 664 F.3d 848, 857 (11th Cir. 2001)). Besides requiring in-person reporting, though, the VSOR affirmatively prohibits Prynne from entering certain properties like schools and daycares, without prior permission. The suggestion that these distinctions could prove to be affirmative disabilities is, thus, plausible.

---

[6] The dissent focuses on the limited effect of the assignment of a specific officer to Prynne's case, as opposed to the semi-annual unannounced inspections that the officer is required to perform. Dissenting Op. at 38–39. The random, in-person checks, some of which occur in public at Prynne's place of employment, are far more akin to the "active supervision" that is performed by a probation officer than mere data collection. *See, e.g.*, *Shaw v. Patton*, 823 F.3d 564–65 ("Historically, a probation officer [takes] on a far more active role in a probationer's life than simply collecting information for a database.").

Third, Prynne alleges VSOR promotes traditional aims of punishment, specifically general deterrence and retribution. J.A. 25. One contemplating committing an offense which requires registration under VSOR may be discouraged from doing so by the negative consequences the registry imposes, thus achieving a deterrent objective. That only persons who commit a crime are required to register, and that the registry imposes harsher requirements for crimes deemed more malicious, reflects a retributive scheme. However, these objectives may be equally "consistent with the regulatory objective." *Smith*, 538 U.S. at 102. Thus, for this factor to be given significant weight, Prynne will have to establish more than "the mere presence" of a deterrent or retributive effect. *Under Seal*, 709 F.3d at 265 (quoting *Smith*, 538 U.S. at 102). Nevertheless, at this stage of the case, Prynne's allegations plausibly support her claim.

Finally, Prynne alleges that the registry serves no nonpunitive purpose and, alternatively, that the punitive effect on her is excessive with respect to the promotion of any nonpunitive goal. However, because courts give significant deference to the legislature, "[a] statute is not deemed punitive simply because it lacks a close or perfect fit with the nonpunitive aims it seeks to advance." *Smith*, 538 U.S. at 103. In evaluating excessiveness, the question is not "whether the legislature has made the best choice possible," but instead, "whether the regulatory means chosen are reasonable in light of the nonpunitive objective." *Id.* at 105.

Unlike in *Smith*, where registrants argued the Alaska registry scheme was invalid because it was not "narrowly drawn" to achieve an otherwise "valid, and rational purpose" of promoting public safety, *id.* at 102, here, Prynne claims that VSOR is not even

14

"rationally related to that end." Appellant's Br. 20. Indeed, Prynne maintains the registry, as a whole, is simply "not effective" and "accomplishes only punitive purposes," particularly as applied to "a female, over-50 registrant" even less likely to reoffend. J.A. 25. Moreover, Prynne argues, some of the more onerous reporting requirements, such as submitting new fingerprints every ninety days, cannot rationally improve public safety— "those are not changing!" Appellant's Br. 24. As opposed to the modest or nonexistent benefit to the public, Prynne alleges the registry imposes incredibly punitive hardships on her and other registrants. Indeed, Prynne claims it "affects every area of life, including [her] decisions about her residence, her family life, her religious community, and her employment." J.A. 20. She claims she has been "shamed" in her neighborhood, and has lost employment and housing opportunities due to the registry. J.A. 21–22. The "random home checks" by the State Police Officer assigned to her case "are an embarrassing part of life." J.A. 16. The registry's restrictions, she argues, have caused her exclusion from "many ordinary and important incidents of community life." J.A. 21. Accepting Prynne's factual allegations as true, Prynne has presented a plausible claim that the registry affects her in an excessively punitive way, despite its intended non-punitive purpose.

It is clear that states may pass retroactive sex offender registry laws, but *Smith* and its progeny "should not be understood as writing a blank check to states" to freely impose retroactive restrictions on sex offenders. *Does #1-5 v.* Snyder, 834 F.3d 696, 705 (6th Cir. 2016). One attempting to invalidate such putatively "civil" regulatory regimes must do so by the "clearest proof" that the statute inflicts punishment. 538 U.S. at 105. Still, "difficult is not the same as impossible." *Snyder*, 834 F.3d at 705 (holding Michigan sex offender

15

registry violated the Ex Post Facto Clause). In examining a motion to dismiss, "[w]e shall not attempt to forecast what further investigation may demonstrate." *Colon Health Ctrs. of Am., LLC v. Hazel*, 733 F.3d 535, 546 (4th Cir. 2013). The Court makes no suggestion as to whether Prynne's claim will ultimately prove successful at a later stage of the litigation. However, her allegations focusing on distinct elements of VSOR's requirements "raise a right to relief above the speculative level," and should survive the relatively low bar of a motion to dismiss. *Twombly*, 550 U.S. at 555. Therefore, we reverse the district court's dismissal of her ex post facto claim.

IV.

The Due Process Clause "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997). A law that "significantly interfere[s]" with a person's fundamental right must withstand strict scrutiny, meaning it must be narrowly tailored to serve a compelling state interest. *Bostic v. Schaefer*, 760 F.3d 352, 377 (4th Cir. 2014) (quoting *Zablocki v. Redhail*, 434 U.S. 374, 386–87 (1978)). Prynne asserts VSOR violates her fundamental rights to travel, work, parent, and privacy. Additionally, Prynne claims the registry as a whole cannot withstand rational basis review. Upon reviewing each argument in turn, we conclude she has not stated a plausible claim for relief under the Due Process Clause.

A.

The right to interstate travel is a fundamental right. *E.g.*, *Griffin v. Breckenridge*, 403 U.S. 88, 105 (1971). The Constitution protects "the right of a citizen of one State to

16

enter and to leave another State." *Saenz v. Roe*, 526 U.S. 489, 500 (1999); *e.g.*, *Edwards v. California*, 314 U.S. 160 (1941) (holding it unconstitutional for a state to prohibit bringing an "indigent," nonresident into the state). Prynne claims her right to travel is burdened by VSOR because she must notify other states she visits of her registry status, which often triggers those states to require her to register on their corresponding registries. Additionally, if she endeavors to relocate her residence to a different state, she must first notify Virginia State Police, so the agency can notify her intended future residence of her registry status. Though these requirements might discourage her from traveling to avoid the hassle of the notification requirements, VSOR does not actually prohibit Prynne from leaving Virginia or entering any other state. Thus, the statute does not restrict her fundamental right to interstate travel.[7]

## B.

There is no broadly defined fundamental right to work. As the Supreme Court has explained, "the Fourteenth Amendment's Due Process Clause includes some generalized due process right to choose one's field of private employment, but a right which is nevertheless subject to reasonable government regulation." *Conn v. Gabbert*, 526 U.S.

---

[7] Other courts have held the same when evaluating comparable registry regimes. *See Doe v. Moore*, 410 F.3d 1337, 1348–49 (11th Cir. 2005) (holding Florida sex offender registry does not infringe on fundamental right to travel by inconvenient reporting requirements); *United States v. Shenandoah*, 595 F.3d 151, 162 (3d Cir. 2010) (holding SORNA requirements to register after traveling to a new state are an "inconvenience" but not an infringement on the right to travel), *abrogated on other grounds*, *Reynolds v. United States*, 565 U.S. 432 (2012); *United States v. Byrd*, 419 F. App'x 485, 491–92 (5th Cir. 2011) ("[R]egistration requirements do not implicate the fundamental right to travel . . . .").

17

286, 291–92 (1999) (interpreting *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923)); *see also Litman v. Harris*, 768 F.3d 1237, 1242 (9th Cir. 2014) ("[A] restriction on the conduct of a profession will run afoul of substantive due process rights only if it is irrational." (alteration in original) (quoting *In re Crawford*, 194 F.3d 954, 961 (9th Cir. 1999)). Prynne contends VSOR violates her right to work because her placement on the registry, and the attendant requirements to verify and publish her place of employment, "makes quality employment almost prohibitively difficult to find." Appellant's Br. 33. As the district court noted, a private employer's decision not to hire a person on the registry due to these requirements is "neither mandated nor regulated by the Commonwealth," and thus not a proper premise for a due process claim.[8]

### C.

The Supreme Court has recognized the fundamental right to have biological children, *e.g.*, *Skinner v. Oklahoma*, 316 U.S. 535, 541 (1942) (prohibiting sterilization), and the fundamental right to raise one's own children, *e.g.*, *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (prohibiting interference with the "care, custody, and control" of one's children). Prynne claims "the Registry has legally sterilized" her because "[t]he Registry intimidated [her] into not having biological children" of her own and has prevented her

---

[8] Prynne does not appear to dispute the district court's conclusion that VSOR's prohibition on working in certain occupations, including as a tow truck or rideshare driver, does not violate the Due Process Clause. In any event, we agree with the district court's conclusion that these restrictions, which prevent registrants from being unsupervised or isolated with potential victims, constitute "reasonable government regulation." *See Conn*, 526 U.S. at 292.

18

from pursuing "parental rights with her step-children." Appellant's Br. 34–35. However, no Virginia law prohibits Prynne or any other registrant from having children, nor does it deny parental rights to registrants who have children. Thus, Prynne, and not the State, determined she would not parent biological children. VSOR does restrict registrants from visiting certain places where children are present, including schools while in session. Although, the Court has not recognized the right to parent stepchildren as a fundamental right, even if it had, a claim that these provisions have burdened her ability to parent her stepdaughter would fail for lack of standing. VSOR allows registrants to petition for exceptions to these prohibitions, and Prynne has not attempted to take advantage of those provisions. Thus, she has pleaded only a "hypothetical" injury and has not shown "either traceability or redressability." *See Doe v. Va. Dep't. of State Police*, 713 F.3d 745, 754–56 (4th Cir. 2013) (dismissing right to parent substantive due process claim for lack of standing where mother had not petitioned for permission to visit school or church properties).[9] Prynne's right to parent claim was properly dismissed.

D.

The Due Process Clause protects one's individual privacy interest "in avoiding disclosure of personal matters." *Walls v. City of Petersburg*, 895 F.2d 188, 192 (4th Cir. 1990). "The more intimate or personal the information, the more justified is the

---

[9] To the extent that Prynne premises her right to parent claim on the prohibition on adopting or fostering a child, we also conclude the claim was properly dismissed. There is no recognized fundamental right to adopt or foster children, and the prohibition is rationally related to the government's aim of protecting vulnerable children from sex offenses.

19

expectation that it will not be subject to public scrutiny." *Id.* Still, even a right to keep personal matters private "is not absolute." *Id.* And, where information is already public, there is no harm to an individual's privacy interest in disseminating the information. *See Paul v. Davis*, 424 U.S. 693, 713 (1976) (rejecting claim that constitutional right to privacy prohibited a state's publication of "a record of an official act such as an arrest"); *Doe v. Moore*, 410 F.3d 1337, 1345 (11th Cir. 2005) (holding distributing public information "does not infringe the fundamental constitutional rights of liberty and privacy."); *see also Smith*, 538 U.S. at 101 (explaining harm to a registrant is not attributable to the dissemination requirements of the registry where "the fact of conviction" itself is already a matter of public record). VSOR largely does just that—republishes information already found within the public records. To the extent that any of the information in the registry could be deemed nonpublic, such as a registrant's work or home address or appearance, the public disclosure is justified by the government's interest in protecting the public by alerting them of the location of known sex offenders. *See A.A. ex rel. M.M. v. New Jersey*, 341 F.3d 206, 211–12 (3d Cir. 2003).[10]

---

[10] Prynne's argument that *Carpenter v. United States*, 138 S. Ct. 2206 (2018), and *Jones v. United States*, 565 U.S. 400 (2012), imply VSOR's collective reporting requirements are an unconstitutional invasion of privacy are also unavailing. First, the electronic GPS-monitoring at issue in *Carpenter* and *Jones* that provided the government the minute-by-minute GPS location of an individual is vastly more intrusive than VSOR's requirement that Prynne self-report information like her home and work addresses after they have changed. Moreover, those cases address the right to be free from unreasonable searches under the Fourth Amendment and do not address the right to privacy embodied in the Due Process Clause.

20

E.

Where a fundamental right or suspect classification is not at issue, a statute "is accorded a strong presumption of validity." *Heller v. Doe by Doe*, 509 U.S. 312, 319 (1993). The law should be upheld unless there is no "reasonably conceivable state of facts that could provide a rational basis for [the statute]." *Id.* at 320; *United States v. Timms*, 664 F.3d 436, 447 (4th Cir. 2012); *see also Glucksberg*, 51 U.S. at 728 (evaluating statute under rational basis review after determining it did not implicate a fundamental right). Moreover, "[a] legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data." *Heller*, 509 U.S. at 320. Prynne maintains that even if VSOR does not impermissibly burden a fundamental right, it would nonetheless be unconstitutional under rational basis review. The lifetime requirement that she register as a sex offender, she argues, is "irrational" because the registry does not actually achieve its purpose of preventing recidivism and because Prynne, in particular, is "*not a recidivism risk.*" Appellant's Br. 42–43. However, the Court is compelled "to accept a legislature's generalizations" and finds the State's contention that VSOR protects the public by reducing sex offenses a "conceivable basis" for the law. *Heller*, 409 U.S. at 321; *see also Smith*, 538 U.S. at 102–03 (finding Alaska sex offender registry served a legitimate purpose "by alerting the public to the risk of sex offenders in their communit[y]" (alteration in original)); *Under Seal*, 709 F.3d at 265. Indeed, in the eyes of the legislators who enacted VSOR, that Prynne has lived "a model life" since her conviction, supports the conclusion that the registry helps prevent recidivism. Thus, as the

21

district court concluded, VSOR passes rational basis review and does not unduly burden Prynne's rights under the Due Process Clause.

V.

In sum, for the reasons stated above, the Court reverses the district court's dismissal of Prynne's ex post facto claim and remands for further proceedings, and affirms the district court's dismissal of the substantive due process claims.

*REVERSED AND REMANDED IN PART,*
*AND AFFIRMED IN PART*

AGEE, Circuit Judge, concurring in part and dissenting in part:

Because the majority opinion misapplies the standard for determining whether a complaint survives a Rule 12(b)(6) motion to dismiss, and because Prynne's complaint fails to plausibly allege facts that would constitute a violation of the Fourteenth Amendment's Ex Post Facto Clause, I respectfully dissent from that part of the decision. However, I concur in the majority opinion's judgment affirming dismissal of Prynne's substantive due process claims.

## I.

### A.

Rule 12(b)(6) tests the legal sufficiency of the complaint rather than resolving contests about the facts or merits of the claim. *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016). The Court reviews a district court's dismissal of a Rule 12(b)(6) claim de novo, applying the exacting standard set out in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). Under this framework, a complaint will be dismissed unless it "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678.[1] To be "plausible," allegations "must be enough to raise a right to relief above the speculative level," *Twombly*, 550 U.S.

---

[1] I have omitted internal quotation marks, alterations, and citations here and throughout this opinion, unless otherwise noted.

23

at 556, and must allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Iqbal*, 556 U.S. at 678.

In determining whether a plaintiff has satisfied this plausibility standard, the Court views the "well-pled facts . . . in the light most favorable to the plaintiff." *Brockington v. Boykins*, 637 F.3d 503, 505 (4th Cir. 2011). But the Court is not required to defer to a complaint's legal conclusions, "and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555; *see Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009) ("[L]egal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement fail to constitute well-pled facts for Rule 12(b)(6) purposes.").

Ordinarily, reciting the standard of review introduces the principles to be applied in the analysis that follows it. But here, this recitation serves a secondary purpose: to establish the majority opinion's failure to properly apply this framework. To be sure, the majority quotes the pertinent *Twombly–Iqbal* standard, but then proceeds to set the bar at ground level, accepting Prynne's legal conclusions just as readily as her threadbare assertions of fact. Properly applying the *Twombly–Iqbal* framework demonstrates the hollowness of Prynne's allegations and confirms the propriety of dismissal under Rule 12(b)(6).

B.

Drawing on factors developed in earlier Ex Post Facto Clause challenges, the Supreme Court's decision in *Smith v. Doe*, 538 U.S. 84 (2003), instructs the analysis of challenges to sex offender registry statutes. The first part of the inquiry "ascertain[s] whether the legislature meant the statute to establish 'civil' proceedings" or punitive

24

criminal proceedings. *Id.* at 92. Prynne concedes that this Court is bound by *Smith* and that, under that precedent, this Court is compelled to conclude that the General Assembly of Virginia intended to enact a civil scheme. Opening Br. 11 n.3. Thus, I agree with the majority opinion's analysis at Section III.B concluding that the record shows the Virginia legislature intended to enact a civil regulatory system through the Virginia Sex Offender and Crimes Against Minors Registry ("VSOR"). *See also* Va. Code § 9.1-900 (describing a civil legislative purpose).

This conclusion does not end the analysis, however, because the companion part of the inquiry asks whether the civil system is nonetheless "so punitive either in purpose or effect as to negate the State's intention to deem it civil." *Smith*, 538 U.S. at 92. Given the deference afforded to legislative intent, "only the clearest proof will suffice to override [that intent] and transform what has been denominated a civil remedy into a criminal penalty." *Id.* To identify circumstances in which "clearest proof" exists, the Supreme Court has identified five "useful guideposts" that are "neither exhaustive nor dispositive." They ask whether the statutory scheme, "in its necessary operation,": (1) "has been regarded in our history and traditions as a punishment"; (2) "imposes an affirmative disability or restraint"; (3) "promotes the traditional aims of punishment"; (4) "has a rational connection to a nonpunitive purpose"; or (5) "is excessive with respect to this purpose." *Id.* at 97.

This second part of the inquiry is where I disagree with the majority's analysis. In short, Prynne has not plausibly alleged an Ex Post Facto Clause violation because she has not alleged facts that could satisfy her obligation of demonstrating "the clearest proof" that VSOR is so punitive in its effect as to overcome the legislature's intent to create a civil

25

system. This is not to say that Prynne was required to come forward with "the clearest proof" to survive the motion to dismiss. Rather, she had to plausibly allege facts to support a claim that Virginia has enacted a regulatory scheme that is so punitive in its purpose and effect as to overcome the legislature's clearly intended purpose of enacting a civil regulation. *See Does v. Wasden*, 982 F.3d 784, 791 (9th Cir. 2020) ("[T]he 'clearest proof' standard refers to a plaintiff's ultimate burden to sustain an ex post facto challenge. . . . To survive a motion to dismiss, . . . Appellants only had to plausibly allege that the [registry], on its face, is punitive in effect."). Because the complaint does not do so, the district court properly dismissed it under Rule 12(b)(6). I address each of the *Smith* factors in turn.

1. No Resemblance to Historical Punishment

*Smith* explained that examining whether a regulatory scheme "has been regarded in our history and traditions as a punishment . . . can be useful because a State that decides to punish an individual is likely to select a means deemed punitive in our tradition, so that the public will recognize it as such." 538 U.S. at 97. Although *Smith* noted that sex offender registries are "of fairly recent origin," which suggests they do "not involve a traditional means of punishing," it left open the possibility that particularly stringent provisions in a registry may cause it to resemble historical punishment. *Id.* Prynne alleges VSOR resembles three traditional forms of punishment: public shaming, banishment, and probation/parole. But VSOR's provisions are not analogous to these historical penalties and thus do not support a claim that it constitutes criminal punishment for ex post facto purposes.

26

## a. Shaming

Prynne claims that VSOR's provisions "inflict a modern version of public shaming" because "registrants stand permanently before the world, pictured on an easily searchable 'sex offender' website with a recitation of their crime." J.A. 23 ¶ 111. This assertion ignores *Smith* and subsequent cases rejecting parallels between online dissemination of factual information in sex offender registries and shaming a person by subjecting them to public ridicule in a historical sense.

The colonial punishment of shaming was "meant to inflict public disgrace" and "held the person up before his fellow citizens for *face-to-face*" confrontation between the offender and the general public. *Smith*, 538 U.S. at 97, 98 (emphasis added). "Shaming" took many forms, sometimes being accompanied by a physical punishment such as whipping, but in all events involving publicity because that is what provoked the shame. *E.B. v. Verniero*, 119 F.3d 1077, 1115–16 (3d Cir. 1997) (Becker, J., concurring and dissenting).[2]

---

[2] Perhaps the best-known example of public shaming comes from *The Scarlet Letter*, which uncoincidentally is the basis for Prynne's pseudonym: Hester Prynne. After being convicted of the crime of adultery, the court opted against imposing the death penalty and instead sentenced Prynne "to stand only a space of three hours on the platform of the pillory, and then and thereafter, for the remainder of her natural life, to wear a mark of shame upon her bosom." Nathaniel Hawthorne, The Scarlet Letter 63 (Brian Harding ed., Oxford Univ. Press 1990) (1850). Hawthorne described the purpose of this punishment in bringing the criminal face-to-face with her fellow citizens for public ridicule: "There can be no outrage, methinks, against our common nature,—whatever be the delinquencies of the individual,—no outrage more flagrant than to forbid the culprit to hide his face for shame; as it was the essence of this punishment to do." *Id.* at 55.

Beginning in *Smith*, courts have contrasted the punishment of shaming from sex offender registries by explaining that registries lack "the publicity and the resulting stigma" that is the purpose behind shaming. 538 U.S. at 99; *see also United States v. Under Seal*, 709 F.3d 257, 265 (4th Cir. 2013) (rejecting the argument that the federal Sex Offender Registration and Notification Act ("SORNA") resembled public shaming because its requirements "have not been regarded in our national history and traditions as punishment"). Instead, registries "disseminat[e] accurate information about a criminal record, most of which is already public." *Smith*, 538 U.S. at 98. And while there may be collateral societal consequences to that information being made available, they are not things the Commonwealth of Virginia has made "an integral part of the objective of the regulatory scheme." *Id.* at 99.

Importantly, the Supreme Court reached this conclusion even though the registry information in *Smith* was disseminated on the Internet. *Id.* at 98 ("Our system does not treat dissemination of truthful information in furtherance of a legitimate governmental objective as punishment.'"). In so holding, it contrasted a typical registration entry from an online site that would allow the public to "shame the offender by, say, posting comments underneath his record." *Id.* at 99. The Court likened a registry to a criminal records database rather than "a scheme forcing an offender to appear in public with some visible badge of past criminality." *Id.*; *accord Femedeer v. Haun*, 227 F.3d 1244, 1251 (10th Cir. 2000) (observing that making a registry available on the internet does not mean that it is "broadcast in a manner approaching the historical examples of public shaming" in part because "Internet notification works merely [as] a technological extension, not a sea

28

change, in our nation's long history of making information public regarding criminal offenses"). Although there have been technological changes since *Smith* was decided in 2002, the fundamentals of posting registries on the Internet remain the same, and *Smith* rejected the notion that widespread or convenient access of the registry causes it to resemble historical shaming. *See State v. Petersen-Beard*, 377 P.3d 1127, 1134 (Kan. 2016) ("*Smith* did not base its conclusion on some old-fashioned, dial-up modem/floppy disk notion of the World Wide Web; nor did it consider accessing offender information on the Internet nothing more than a walk to the courthouse to thumb through publicly available paper files. *Smith*'s rationale withstands the more recent development of a mobile, smartphone Internet.").

To the extent Prynne's arguments simply disagree with *Smith*, they fail. She does point to two differences between her case and *Smith*, but neither causes VSOR to resemble public shaming. First, the registry in *Smith* apparently did not involve the creation of any content beyond the criminal record for inclusion in the registry database. In contrast, VSOR's online database includes the independent designation that Prynne's offense of conviction has been classified as a "Tier III" offense, the most serious classification on the registry. *See* Va. Code § 9.1-911 ("The Registry shall also include a separate indication that the person has been convicted of a Tier III offense.").[3] But this administrative notation

---

[3] In 2020, after briefing in the appeal was finished, Virginia amended Va. Code § 9.1-911 to the language cited. Previously, the statute did not refer to tiers of offenses, but instead used the descriptive label of whether the individual had been convicted of a "sexually violent offense." Va. Code § 9.1-911 (2003) ("The Registry shall also include a separate indication that a person has been convicted of a sexually violent offense."). Thus, (Continued)

provides users with publicly available information about the statute of conviction, which

they could otherwise obtain by cross-referencing an offender's crime of conviction with

VSOR's classification of that offense for purposes of determining which provisions apply

to each classification of registrant. This practical and perfunctory data point disseminates

accurate information that would be publicly available elsewhere by accessing Prynne's

criminal record and consulting the Code of Virginia. In no way does the Tier III notation

hold Prynne up to public ridicule akin to the colonial punishment of shaming. *Accord*

*Verniero*, 119 F.3d at 1099–1100 (concluding that a registry disseminating accurate public

record information about a registrant's "past criminal activities and a risk assessment by

responsible public agencies based on that information" does not result in a "sting" akin to

"ridicule and shaming").[4] Because this designation still constitutes the mere "dissemination

---

before the 2020 amendments, the words "Violent: Yes" appeared on Prynne's registry page to indicate that she had been convicted of an offense the legislature classified as a sexually violent offense for purposes of VSOR. This change does not affect the analysis because this prior wording is not the equivalent of public shaming for the same reasons the Tier III designation is not.

[4] VSOR operates in a fundamentally different manner than the sex offender registry at issue in *Does #1–5 v. Snyder*, 834 F.3d 696 (6th Cir. 2016), in which that court held that Michigan's registry did resemble traditional shaming because "the ignominy under [the registry] flows not only from the past offense, but also from the statute itself." *Id.* at 703. As examples, the Sixth Circuit noted that Michigan's registry required individuals to classify as Tier III sex offenders even when their crime of conviction "would not ordinarily be considered sex offenses" and it also required registration by juvenile offenders whose "criminal record would not be available to the public" apart from the registry's retroactive application. *Id.* at 703.

Prynne has not alleged that VSOR requires individuals to register as sex offenders when the otherwise-publicly available information about them would not already inform the public of that fact. Certainly, it is not true of her because her conviction, committed as an adult, was for taking indecent liberties with a child by a person in a custodial or (Continued)

30

of information," it cannot be the basis of a plausible argument that VSOR is a modern corollary to public shaming.

Second, Prynne contends VSOR materially differs from the Alaska registry at issue in *Smith* because it requires updates to the database to be automatically provided to schools, foster homes, assisted-living, and nursing facilities. *See* Va. Code § 9.1-914. But a select active notification still consists of the public dissemination of publicly available information, which *Smith* and *Under Seal* concluded was dissimilar to shaming. It neither produces a public confrontation nor holds Prynne out as an object of ridicule to the community at large. *See Anderson v. Holder*, 647 F.3d 1165, 1173 (D.C. Cir. 2011) (holding that active notification, while "more burdensome to sex offenders than the passive notification scheme in *Smith*" was not punitive); *People v. Malchow*, 739 N.E.2d 433, 439–40 (Ill. 2000) (concluding an active notification system that "provide[d] for a limited dissemination of matters of public record . . . . clearly is not analogous to stigmatization penalties"). As such, this component of VSOR cannot serve as a basis for Prynne's argument that the system resembles a traditional punishment.

---

supervisory relationship. *See* Va. Code § 18.2-370.1. In short, the "Tier III" designation on the registry database does not create a new stigma. Instead, it reflects that Virginia has classified convictions for Va. Code § 18.2-370.1, categorically, as one of the most serious sex offenses. Moreover, Prynne has not brought a claim challenging Virginia's decision to classify her offense as a Tier III offense, and the Supreme Court of Virginia has previously rejected that argument. *See McCabe v. Commonwealth*, 650 S.E.2d 508 (Va. 2007) (holding that the reclassification of Va. Code § 18.2-370.1 convictions to the designation "sexually violent offense" for purposes of VSOR did not violate the rights of individuals previously classified as "sex offender[s]" on the registry).

31

b. Banishment

Nor does VSOR resemble banishment, wherein "[t]he most serious offenders . . . could neither return to their original community nor, reputation tarnished, be admitted easily into a new one." *Smith*, 538 U.S. at 98. In brief, banishment has been universally recognized as compelled exile from the body politic. *See United States v. Ju*, 198 U.S. 253, 269–70 (1905) (describing it as "punishment inflicted upon criminals, by compelling them to quit a city, place, or country, for a specified period of time, or for life"); *accord Shaw v. Patton*, 823 F.3d 556, 566 (10th Cir. 2016) (describing it as "expulsion, or deportation by the political authority on the ground of expediency; punishment by forced exile, either for years or for life; a punishment inflicted upon criminals, by compelling them to quit a city, place or country, for a specified period of time").

Prynne alleges VSOR resembles this historical punishment because it "banishes" her from entering schools, daycares, and churches operating a school or daycare. Even accepting that characterization as true, none of VSOR's challenged provisions require Prynne or other registrants to leave the community--a fundamental difference from banishment regardless of any additional distinguishing characteristics. Indeed, several circuit courts have recognized that even some residency restrictions—which the provisions at issue here do not approach—do not resemble the historical punishment of banishment. *E.g.*, *Shaw*, 823 F.3d at 568 ("Shaw has not been expelled from an entire community; he claims only that 'vast spaces' have been 'declared off limits.' His inability to inhabit these areas might substantially affect his residential choices, but this impediment—regardless of its severity—does not constitute expulsion from a community."); *Doe v. Miller*, 405 F.3d

32

700, 719– (8th Cir. 2005) (concluding a residency restriction is not analogous to banishment because, among other things, it "does not 'expel' the offenders from their communities or prohibit them from accessing areas near schools or child care facilities for employment, to conduct commercial transactions, or for any purpose other than establishing a residence").[5]

More problematic for Prynne, the text of the relevant VSOR provisions shows that she has not been permanently barred from the three locations she identifies.[6] As discussed in greater detail in the next section, VSOR restricts Prynne from being on school and daycare properties during certain times corresponding to when minors will be present, but it contains exceptions for permitted purposes as well as the opportunity to obtain a court-order permitting her presence, and there are no blanket prohibitions on church attendance. A statute with these nuances does not correspond to "banishment." What is more, presence

---

[5] Some courts have found that *certain* residency restrictions sufficiently resemble banishment so as to cause this factor to favor the registrant. Even accepting that something short of compelled expulsion from the community may resemble banishment for purposes of this inquiry, that would still be a substantially more restrictive provision than the VSOR ones challenged here. For example, in *Snyder*, the Sixth Circuit concluded that Michigan's registry resembled banishment and thus favored the registrant's argument that it was punitive. 834 F.3d at 701. While acknowledging that Michigan's registry did not do what the traditional punishment of banishment entailed, it nonetheless concluded the "geographical restrictions [were] nevertheless very burdensome, especially in densely populated areas." *Id.* Prynne has not alleged any facts approaching that level of burden.

[6] In considering a Rule 12(b)(6) motion to dismiss, courts are not required to accept as true a complaint's characterizations of the governing law, but instead, must look to the text of the challenged provisions. *See Nemet Chevrolet, Ltd.*, 591 F.3d at 255 (stating the court does not defer to a complaint's legal conclusions when deciding a Rule 12(b)(6) motion); *accord Neitzke v. Williams*, 490 U.S. 319, 326 (1989) ("Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law.").

on school and daycare properties has historically been regulated in diverse ways to keep minors safe wholly apart from the specific restriction applicable to sex offender registrants, further removing this provision from the historical punishment of banishment. Va. Code § 18.2-128 (penalizing "*[a]ny person*" from being on school property at night "for any purpose other than to attend a meeting" or at any time after being "direct[ed] to vacate the property by a person authorized to give such direction" or "in violation of . . . any posted notice which contains such information, posted at a place where it reasonably may be seen" (emphasis added)); Fairfax Cnty. Public Schools, Visitors to Schools Sch. Bd. Policy 1360 (2021) (directing all visitors to "go immediately to the principal's office and obtain a visitor's pass" on penalty of being "considered trespassers" in violation of Va. Code § 18.2-128); *see also* Va. Code § 18.2-308.1 (prohibiting any person who knowingly carries a firearm or other weapons from going on school property and subjecting them to criminal penalties).

In addition to VSOR's text not doing what Prynne asserts it does, her complaint acknowledges that many of her decisions related to community involvement are not compelled by VSOR, but instead are voluntary personal decisions. For instance, she claims "she must avoid interactions with children," J.A. 21 ¶ 97, and that "*[e]ven if the letter of the law would not prohibit a particular activity*, prudence requires [her] and her husband to eschew many ordinary and important incidents of community life, to avoid either children or the appearance of impropriety," J.A. 21 ¶ 98 (emphasis added). While it's commendable that Prynne does not desire to violate the terms of the registry, VSOR requires only what its text demands. Prynne cannot hold the Commonwealth liable for

34

punishing her for constraints that she alone has imposed on herself. Those precautions do not arise from a VSOR provision *compelling* her expulsion as would have been true if she were subjected to the historical practice of banishment.

Prynne also alleges that she "has lost housing opportunities and jobs" as a consequence of private landlords and employers learning of her status, and that she "has been a victim of vigilantism" after "neighbors learned of her registry status." Opening Br. 17; J.A. 21 ¶ 99 – 22 ¶ 105. Much like Prynne's own decisions, allegations concerning the choices of private citizens do not plausibly allege the existence of a *state-imposed punishment* akin to banishment. *See Millard v. Camper*, 971 F.3d 1174, 1182 (10th Cir. 2020) ("[T]he Appellees' struggles here did not stem from affirmative state action . . . but instead from third parties and businesses implementing their own procedures . . . . which does not constitute 'banishment.'"); *Doe v. Pataki*, 120 F.3d 1263, 1284 (2d Cir. 1997) ("With banishment, the state acts to remove the offender. By contrast, if a sex offender is evicted by his landlord or pressured to move from his residence by his neighbors . . ., those private actions, however unfortunate, are not the intended consequences of the [registry], and the historical analogy [to banishment] fails.").

In short, banishment entails "a sanction designed to remove an individual from a specific geographic area." *Shaw*, 823 F.3d at 566. Prynne has not alleged any circumstances arising from VSOR's challenged provisions that impose such a punishment.

### c. Probation and Parole

Lastly for this factor, Prynne maintains that VSOR's "reporting requirements resemble the criminal punishment of probation or parole." Opening Br. 14. As support, she

points to VSOR's in-person reporting requirements, the criminal penalties associated with a failure to comply, and, in particular, the assignment of a specific officer to monitor her compliance. Both the Supreme Court's and this Court's precedent have previously held that all but one of these provisions do not create a system resembling probation and parole. Prior cases have addressed—and rejected—the first two alleged corollaries, and VSOR's assignment of a particular officer to a registrant does not so alter the existing precedent that it could sustain Prynne's claim.

For the most part, the distinguishing characteristics between probation or parole, on the one hand, and the requirements of sex offender registries, on the other, hold equally true of VSOR. As *Smith* recognized, individuals on probation or parole are subjected to mandatory conditions of release, regular supervision, and revocation of release in the event of an infraction. *See* 538 U.S. at 101. Those conditions typically involve significant limitations on daily life, "such as mandating employment, requiring consent before moving or changing jobs, and forbidding drug and alcohol use." *Millard*, 971 F.3d at 1182–83. In the same way, law enforcement plays a "far more active role . . . in a probationer's life" by overseeing their reentry, meeting regularly, and providing the requisite consent to changes in living or working conditions. *Id.*

Although VSOR imposes additional obligations on Prynne than the registry in *Smith*, they still fall well-short of the sort of active law enforcement supervision typical of probation and parole. For instance, VSOR does not constrain where Prynne lives or require her to work. Nor does it require her to obtain permission before making these decisions about her life. As with other registries deemed not to be akin to probation or parole, VSOR

36

requires Prynne only to report changes in address, employment, and other circumstances *after* they occur. *Smith*, 538 U.S. at 101; *see also Shaw*, 823 F.3d at 565 (discussing ways in which probation historically involved prior consent and conditions that intrude well beyond regular reporting obligations). The monitoring of compliance alleged to occur under VSOR also falls well short of the regular coordination typical of probation and parole. *See* Va. Code § 9.1-907(C) (requiring semiannual "physical[] verif[ication]" of registrant's information).

Additionally, as was true of the registry at issue in *Smith*, any prosecution under VSOR for failure to comply with its requirements "is a proceeding separate from the individual's original offense" rather than arising directly from the originally imposed punishment. *Smith*, 538 U.S. at 102. That new criminal penalties can arise for failure to follow registration requirements does not reflect that the registry system is punishment for the original offense, as would be true of the penalties associated with violations of probation or parole. *United States v. Wass*, 954 F.3d 184, 190, 191 (4th Cir. 2020) (reiterating the Court's rejection of the argument that SORNA is punitive for subjecting registrants to new criminal penalties for non-compliance because it "punishes conduct that occurs after its enactment" and "constitutes a new criminal offense" as opposed to altering the form of punishment for the pre-SORNA offense as in the case of revocation of supervised release); *Shaw*, 823 F.3d at 566 (distinguishing failure-to-register offense from the registry because compliance with "reporting requirements are regulatory requirements separate from [a registrant's] underlying sex-offense conviction," while probation and parole violations result in revocation of release and "imprisonment for the underlying

37

offense"). Accordingly, the threat of future criminal punishment for failure to comply with the registry is not akin to the threat of revocation of probation or parole as stricter punishment for the original offense that results from failure to comply with the terms of release. *But see Snyder*, 834 F.3d at 703 (concluding the registry at issue resembled probation and parole because "the basic mechanism and effects have a great deal in common" even though "the level of individual supervision is less than is typical of parole or probation").

As noted, according to Prynne, the one allegedly novel feature of VSOR is that a specific officer is assigned to each registrant. That characteristic, however, does not by its nature transform the registry into a punitive regimen resembling probation or parole.[7] Prynne's reliance on this feature misdirects attention from the salient inquiry in determining resemblance—*i.e.*, the substantive obligations on both the Commonwealth and the individual—to a superficial similarity in how the two systems are administered. Put another way, this factual similarity matters only if it makes VSOR more akin to the punishment of probation or parole. *E.g.*, *Smith*, 538 U.S. at 98 (rejecting "[a]ny *initial* resemblance" to punishments as "misleading" after conducting a substantive comparison

---

[7] Prynne does not cite any provision of VSOR that mandates the assignment of a specific officer to her case, and the Commonwealth does not specifically respond to this argument. VSOR's language refers to reporting to a designated agency as opposed to a particular, assigned individual. It may well be that Prynne is referring to something in practice that is not specifically required by VSOR. Notwithstanding this concern about what VSOR requires, the above analysis assumes for purposes of this appeal that a specific individual is assigned to receive a registrant's updates and perform the semiannual compliance check.

(emphasis added)). It does not. As a result, this allegation cannot materially change the inquiry or provide plausible factual support for Prynne's claim.

To begin, Prynne does not allege any facts suggesting that the assignment of a specific officer creates any more onerous requirements on her for purposes of compliance. VSOR's registration and update requirements direct individuals to register or provide updates to "the designated law-enforcement agency of that state," "the local law-enforcement agency," or "the Department of State Police" as opposed to needing to coordinate with a specific individual. Va. Code §§ 9.1-903 to -906. Prynne has not alleged that she faces any greater burden from having been assigned to a specific officer than to the department as a whole. Her registry obligations remain the same.

Prynne emphasizes that the "personally assigned" "enforcement officer" "monitor[s] compliance with" VSOR. Opening Br. 14. But the assignment of a single officer makes no difference to the inevitable efforts of every state or federal department tasked with monitoring compliance. Nor does the assignment of a single officer increase the level of monitoring conducted by the Commonwealth, which—as discussed earlier—does not entail the sort of supervision or control that occurs during probation and parole. The substantive compliance measures render a specific registry analogous to or distinguishable from probation or parole, not who within the State performs that task.[8]

---

[8] In *Shaw v. Patton*, 823 F.3d 556 (10th Cir. 2016), the Tenth Circuit distinguished Oklahoma's registry from the historical use of probation on several grounds, one of which was the observation that "no specific officer with the Department of Corrections is assigned to consult with Mr. Shaw or to supervise him." *Id.* at 564. While that may have been one factor in *Shaw*'s analysis, it was not dispositive to the inquiry. In fact, *Shaw*'s substantive (Continued)

In sum, this characteristic does not alter the analysis and therefore cannot aid Prynne in demonstrating that VSOR is punitive as a result of being a corollary to probation or parole.

\* \* \* \*

For these reasons, the challenged VSOR provisions do not resemble any traditional method of punishment. As such, this factor cannot weigh in Prynne's favor and the majority opinion errs in concluding otherwise.

### 2. No Affirmative Disability or Restraint

Turning to the second *Smith* factor, a comparison of Prynne's allegations, VSOR, and the relevant case law shows that she has not plausibly alleged the existence of an affirmative disability or restraint that would be deemed punitive. A consistent thread throughout the case law has been the recognition that just because a sex offender registry imposes burdens on a registrant's life, that does not mean those burdens are cognizable as affirmative disabilities or restraints. But instead of grappling with this settled precedent

---

analysis is entirely consistent with the distinction made earlier between the administrative aspects of the registry and the substantive compliance measures undertaken by the state, as the court recognized:

> Historically, a probation officer [takes] on a far more active role in a probationer's life than simply collecting information for a database. Thus, when a probation officer does not actively supervise a probationer, the subject is not 'under probation,' as it was historically understood. The absence of supervision distinguishes Mr. Shaw's reporting requirements from the historical understanding of probation.

*Id.* at 564–65.

describing what sorts of restrictions do not constitute an affirmative disability or restraint for purposes of this inquiry, the majority opinion mistakenly accepts that the types of burdens VSOR imposes could satisfy this inquiry. However, when placed under the microscope of settled law, the challenged provisions do not constitute affirmative disabilities or restraints for purposes of this inquiry.

In *Smith*, the Supreme Court explained that the relevant inquiry considers "how the effects of the [registry] are felt by those subject to it. If the disability or restraint is minor and indirect, its effects are unlikely to be punitive." 538 U.S. at 99–100. As was true in *Smith* and *Under Seal*, VSOR "imposes no physical restraint, and so does not resemble imprisonment, which is the paradigmatic affirmative disability or restraint." *Id.* at 100; *Under Seal*, 709 F.3d at 265. Despite this disconnect, Prynne asserts that VSOR "affirmatively restrains and disables [her] conduct" in three ways: (1) by "banish[ing]" her "from schools, churches and daycares"; (2) by barring her from "a laundry list of public transportation and childcare-related jobs"; and (3) by "impos[ing] extensive in-person reporting requirements." Opening Br. 17. VSOR's prohibitions, however, fall well short of plausibly being punitive affirmative disabilities or restraints. Accordingly, Prynne's contentions lack merit.

a.

Although VSOR prohibits registered sex offenders from being on school or daycare property during operational hours without advanced authorization, this standard registry provision is not an affirmative disability or restraint. At the outset, the complaint cites Va. Code §§ 18.2-370.2 to -370.5 and mentions provisions restricting residency for some

41

individuals and prohibiting loitering, among other restraints. Those provisions are not retroactively applicable to Prynne and therefore cannot violate the Ex Post Facto Clause, as the majority opinion appropriately recognizes. *See* Maj. Op. 9.

Prynne is, however, subject to a narrower set of retroactively applicable restrictions, which prohibit Tier III offenders from being on school or daycare property, including school buses, when school or school-sponsored activities are underway:

> Every adult who is convicted of a Tier III offense . . . shall be prohibited from entering or being present (i) during school hours, and during school-related or school-sponsored activities upon any property [s]he knows or has reason to know is a public or private elementary or secondary school or child day center property; (ii) on any school bus as defined in § 46.2-100; or (iii) upon any property, public or private, during hours when such property is solely being used by a public or private elementary or secondary school for a school-related or school-sponsored activity.

Va. Code § 18.2-370.5(A). Several exceptions are noted, including authorization to be on school property to vote or if the individual is an enrolled student at the school. § 18.2-370.5(B). Further, individuals can seek a court order allowing them to be on school property upon providing notice and showing good cause. § 18.2-370.5(B)–(C).

Prynne has not alleged facts demonstrating that this provision constitutes an affirmative disability or restraint of the sort that could convert VSOR into a punitive regimen for ex post facto purposes. Although the complaint broadly posits that this provision "severely limit[s] the ability of parents on the Registry to aid their children in the normal incidents of childhood or education," J.A. 17 ¶ 63, by the statute's plain terms, registrants can seek a court order exempting them from this restriction. There are no factual allegations that suggest the exemption process is a sham or registrants are regularly unable

42

to obtain exemptions. And as for Prynne's specific circumstances, the complaint does not allege that she ever attempted to obtain such an order, let alone that she was denied authorization. Instead, her allegations refer only obliquely to being "unable to attend *most* of her step-daughter's school functions." J.A. 20 ¶ 94 (emphasis added).

What's more, the provision offers no basis for Prynne's contention that it prohibits registrants from attending worship services. To be sure, she alleges that she "*feel[s]* unable to attend many in-person church services, because they inevitably have religious education for children on the premises." J.A. 17 ¶ 65 (emphasis added). But the restriction applies to school and daycare properties only during hours when those activities are occurring and it applies to other properties only "when such property is *solely* being used by a public or private . . . school for a school-related or school-sponsored activity." § 18.2-370.5(A) (emphasis added). Prynne's unfounded speculation about whether she can engage in certain religious activities has no bearing on whether the registry statute constitutes an affirmative disability or restraint. VSOR is silent about attending church services. And without factual allegations to support Prynne's sweeping and unsupported assertions that church attendance could be impeded by this restriction, she has not plausibly alleged the existence of an affirmative disability or restraint.

All told, the narrowness of the actual restriction—applying only to presence on school and daycare properties when being used as such (*i.e.*, when minors are on the property)—coupled with the opportunity to request an exemption, removes it from the sort of affirmative disability or restraint that could support an ex post facto claim. *See Vasquez v. Foxx*, 895 F.3d 515, 521–22 (7th Cir. 2018) (affirming dismissal of an ex post facto

43

claim in part because a registry's residency restriction does not constitute an affirmative disability or restraint on sex offenders because it did not come close to resembling imprisonment); *Shaw*, 823 F.3d at 568–69 (same); *State v. Kirby*, 120 N.E.3d 574, 480 (Ind. Ct. App. 2019) (concluding a school property restriction was not an affirmative disability or restraint despite the plaintiff wanting to observe his son participate in school activities because it did not restrict residency, impose any cost directly or indirectly, and schools restrict all manner of individuals from visiting their premises without being deemed punitive).

Conversely, this restriction is far less onerous than the sort that courts have concluded, at the motion to dismiss stage, plausibly constitute an affirmative disability or restraint that could be punitive in nature. For example, the Eleventh Circuit held that a group of plaintiffs who were on Florida's registry and had experienced homelessness as a result of the scheme's residency restrictions, which were "among the strictest in the nation," had sufficiently alleged an affirmative disability or restraint so as  to survive a Rule 12(b)(6) motion. *Doe v. Miami-Dade Cnty.*, 846 F.3d 1180, 1185–86 (11th Cir. 2017). There, the plaintiffs alleged that the residency restrictions had forced them to live in homeless encampments because they could not live with family or locate affordable housing options in the permitted geographical areas despite multiple attempts to do so. *Id.* at 1185. In view of these allegations, the court concluded that plaintiffs had plausibly alleged the existence of an affirmative disability or restraint arising from a residency restriction that so affected "available, affordable housing options" as to "drastically exacerbat[e] transience and homelessness" experienced by the plaintiffs. *Id.*

Similarly, although at a different procedural posture, the Supreme Court of Indiana held that a registrant had shown the existence of an affirmative disability or restraint because the registry's residency restriction prohibited him from "liv[ing] in a house he own[ed] and in which he ha[d] resided for approximately 20 years," thus requiring him to "incur the cost of obtaining other housing and relocating his residence." *State v. Pollard*, 908 N.E.2d 1145, 1150 (Ind. 2009). As part of its analysis, the Indiana court also observed that the challenged provision contained no exceptions for established residences that pre-dated the arrival of a school or youth program center within the restricted distance. *Id.*; *see also Commonwealth v. Baker*, 295 S.W.3d 437, 445 (Ky. 2009) (holding that a registry's residency restriction "place[d] significant limitations on where a registrant may live" and created a "constant threat of eviction because there is no way for him or her to find a permanent home").

But Prynne alleges nothing near the constraints found in these cases. In short, the VSOR provision does not come close to placing an affirmative disability or restraint like those considered in *Doe* and *Pollard* that would rise to the level of plausibly constituting punishment. As a result, Prynne's allegations cannot support an Ex Post Facto Clause violation.

b.

The complaint also alleges VSOR registration prohibits Prynne from becoming licensed or obtaining employment in certain fields. She claims that Virginia law prohibits her from teaching children; operating a daycare; working for a rideshare service, Va. Code

45

§ 46.2-2099.49(C)(1); and driving a tow truck, Va. Code § 46.2-116(C).[9] But the Supreme Court has long rejected the contention that prohibitions on certain types of employment constitute an affirmative disability or restraint. In *Smith*, the Supreme Court reiterated that "sanctions of occupational debarment" are "nonpunitive." 538 U.S. at 100; *Shaw*, 823 F.3d at 569 ("[T]he Supreme Court has held that a lifelong bar on work in a particular industry does not constitute an affirmative disability or restraint that is considered punitive.").

For example, in *Hudson v. United States*, 522 U.S. 93 (1997), the Supreme Court rejected a petitioner's argument that being "prohibited from further participating in the banking industry" constituted an "affirmative disability or restraint" because it was "certainly nothing approaching the 'infamous punishment' of imprisonment." *Id.* at 104; *see also De Veau v. Braisted*, 363 U.S. 144, 160 (1960) (plurality op.) (rejecting argument that a statute prohibiting felons from being employed on the waterfront in the Port of New York violated the Ex Post Facto Clause because its aim was not "to punish [ex-felons] for past activity" but to ascertain "the proper qualifications for a profession" and "effectuat[e] . . . that scheme"); *Hawker v. People of N.Y.*, 170 U.S. 189, 191–94 (1898) (rejecting

---

[9] More broadly, the complaint observes that many employers simply do not hire individuals who are on the registry. But the alleged decision of a private employer not to hire someone is not something that would result in the Commonwealth's liability under the Ex Post Facto Clause. *See Millard*, 971 F.3d at 1183 (observing that a private employer's decision not to hire a registrant is an effect that is "less harsh" than collateral consequences of state action the Supreme Court has held do not violate the Ex Post Facto Clause); *Pataki*, 120 F.3d at 1280 (observing that a private employer's decision not to hire a registrant is not state action, but rather the act of a "private third part[y]" that would be publicly available and disclosed as a result of the underlying conviction anyway, and "flow essentially from the fact of the underlying conviction" rather than the individual's mere presence on the registry).

argument that a state law prohibiting ex-felons from practicing medicine violated the Ex Post Facto Clause because it fell within the state's police power to "prescribe the qualifications of" individuals authorized to work in certain professions and to "require both qualifications of learning and of good character" by "prescribing in a general way" that good character consists of, inter alia, not having been convicted of certain crimes).

Based on the Supreme Court's clear guidance, Prynne has not plausibly alleged that the State has imposed an affirmative disability or restraint as a result of prohibitions on her employment.

c.

As for VSOR's in-person reporting requirements, Prynne correctly observes that the Supreme Court's affirmative disability analysis in *Smith* considered reporting requirements that did not have to be fulfilled in person. But many circuit courts since *Smith*, including this Court, have recognized that, although in-person reporting can be more burdensome, it is not dispositive to whether a requirement places an affirmative disability or restraint resembling punishment. As this Court held when rejecting a similar argument about SORNA, being required "to appear periodically in person to verify . . . information and submit to a photograph . . . is not an affirmative disability or restraint" because "'[a]ppearing in person may be more inconvenient, but requiring it is not punitive.'" *Under Seal*, 709 F.3d at 265 (quoting *United States v. W.B.H.*, 664 F.3d 848, 857 (11th Cir. 2001)); *Am. Civil Libs. Union of Nev. v. Masto*, 670 F.3d 1046, 1056 (9th Cir. 2012) (observing that *Smith*'s discussion of registration requirements that do not need to be in person "did

47

not amount to a holding that in person registration necessarily constitutes an affirmative disability").

None of the in-person reporting requirements Prynne challenges impose greater burdens than the sorts of restrictions courts have routinely held do not constitute an affirmative disability or restraint. For example, the complaint cites VSOR's quarterly in-person photograph and registration renewal provisions as well as its requirement to update the registry when certain information changes within three business days. But we have previously held that SORNA's identical in-person registration and update requirements do not impose affirmative restraints and disabilities. *Under Seal*, 709 F.3d at 265; *see* 34 U.S.C. §§ 20913 (registration and update requirements), 20918 (periodic in-person verification requirements).[10] In addition to observing that an inconvenience does not make a provision punitive, this Court relied on the rationale that the in-person updates are not to "seek permission" before carrying on with their lives, but rather to report changes after they occurred. *Under Seal*, 709 F.3d at 265.[11]

This conclusion is consistent with the holdings of numerous circuit courts considering various sex offender registries' similar or identical in-person reporting requirements and concluding that they are not the sort of affirmative disability or restraint

---

[10] In 2017, Congress recodified these provisions from 42 U.S.C. §§ 16913 and 16916, the provisions cited in *Under Seal*, to their present location. The relevant substantive provisions of SORNA were not altered.

[11] The Alaska registry at issue in *Smith* also required quarterly updates though those did not have to be in-person. 428 U.S. at 101.

that would constitute punishment. *E.g.*, *Shaw*, 823 F.3d at 568–69 (collecting cases for the proposition that "[o]ther circuits have ordinarily held that in-person reporting requirements are not considered punitive," and observing that harsher restrictions than in-person reporting have been deemed non-punitive, so they are also non-punitive); *Masto*, 670 F.3d at 1056–57 (holding that a "requirement that sex offenders present themselves for fingerprinting"—for the highest level of offender, "[n]ot less frequently than every 90 days"—is "more inconvenient," but "is not akin to imprisonment" and so "does not constitute an affirmative disability"); *W.B.H.*, 664 F.3d at 857 ("Appearing in person may be more inconvenient, but requiring it is not punitive.").

\* \* \* \*

In sum, the restrictions Prynne complains of do not rise to the level that could plausibly entail an affirmative disability or restraint. They do not approach imprisonment, the "paradigmatic" affirmative disability or restraint, and they also impose less severe restraints than those this Court and others have held do not rise to that level. *Smith*, 538 U.S. at 100. As such, Prynne's allegations cannot support an ex post facto claim.

### 3. Does Not Promote the Traditional Aims of Punishment

Turning to the third *Smith* factor, Prynne broadly asserts that VSOR promotes the punitive goals of "incapacitation, deterrence, and retribution." Opening Br. 20. This is sufficient for the majority, which deems the fact that VSOR applies only to individuals convicted of sex offenses and tailors the duration of the obligations to the nature of the offense sufficient at this stage to support her claim. Nonetheless, it is constrained to

49

acknowledge "Prynne will have to establish more than 'the mere presence of'" those effects for this factor to carry "significant weight." Maj. Op. 14.

For the reasons already discussed, however, the challenged VSOR provisions can neither incapacitate nor punish Prynne in a manner akin to traditional forms of punishment. That they apply only to individuals convicted of a sex offense is of no moment because that is true of *every* sex offender registry in every ex post facto case. Clearly, the Supreme Court would have required more than this fact for a registry to be deemed prohibitively retributive. Similarly, tailoring the registry's requirements to the legislature's determinations concerning the severity of an individual's underlying conviction does not mean that the registry has a retributive purpose either. To suggest otherwise, as the majority opinion does, ignores *Smith*'s discussion of why sex offender registries are *not* retributive as a result of tailoring their requirements—including the duration of the obligations—to the registrant's offense of conviction. As the Supreme Court explained:

> The Court of Appeals was *incorrect* to conclude that the Act's registration obligations were retributive because the length of the reporting requirement appears to be measured by the extent of the wrongdoing, not by the extent of the risk posed. The Act, it is true, differentiates between individuals convicted of aggravated or multiple offenses and those convicted of a single nonaggravated offense. *The broad categories, however, and the corresponding length of the reporting requirement*, are reasonably related to the danger of recidivism, and this is consistent with the regulatory objective.

538 U.S. at 102 (emphases added). As this language in *Smith* demonstrates, the majority opinion turns the retributive purpose inquiry on its head by holding that the very characteristics that rendered the Alaska registry at issue in *Smith* non-punitive somehow

50

disconnect into qualities that could potentially transform VSOR into retribution. It clearly errs in so doing.

Further, in *Smith*, the Supreme Court discounted the significance of a generalized deterrent effect to this particular inquiry. As it explained, "[a]ny number of governmental programs might deter crime without imposing punishment," and to hold otherwise "would severely undermine the Government's ability to engage in effective regulation." *Id.*; *see also Under Seal*, 709 F.3d at 265 (citing *Smith* to conclude that "SORNA does not promote the traditional aims of punishment"); *Doe v. Bredesen*, 507 F.3d 998, 1005–06 (6th Cir. 2007) (same, for Tennessee's registry).

VSOR's express and undisputed objective is to protect its citizens and promote safety, a civil purpose that falls squarely within the Commonwealth's police powers. This plainly permissible civil purpose is consistent with expressed purposes of the sex offender registries at issue in *Smith* and *Under Seal. Cf. Vasquez*, 895 F.3d at 522 (observing that Illinois' residency restrictions are "clearly *not* retributive" because, "[a]s in *Smith*, the obvious aim of the statute is to protect children from the danger of recidivism by convicted child sex offenders"); *Anderson*, 647 F.3d at 1173 (rejecting punitive purpose argument as to D.C.'s sex offender registry because it "exacts no greater retribution than the civil and nonpunitive statute at issue in *Smith*").

In short, precedent forecloses Prynne's conclusory assertions about VSOR promoting retributive and deterrent aims. Accordingly, this factor cannot support her claim.

51

4. A Rational Connection to a Legitimate, Non-Punitive Purpose

For the fourth *Smith* factor, Prynne's complaint raises no plausible claim that the registry lacks a "rational connection to a nonpunitive purpose." 538 U.S. at 97. This is "a most significant factor" to the analysis, *id.* at 102, but it is also not a demanding standard, *Miller*, 405 F.3d at 721.

In many cases, the existence of a non-punitive goal is not seriously challenged given that by the time this factor is discussed, courts have already recognized that the legislature articulated a rational, non-punitive basis for enacting what it intended to be a civil regulatory scheme. And as *Smith* noted, "imposition of restrictive measures on sex offenders adjudged to be dangerous is a legitimate non-punitive governmental goal and has been historically so regarded." *Id.* at 93. This Court has followed suit, acknowledging SORNA's "rational connection to a legitimate, non-punitive purpose—public safety—which is advanced by notifying the public to the risk of sex offenders in their community." *Under Seal*, 709 F.3d at 265.

As was true of other registries, VSOR is rationally related to the legitimate, nonpunitive goal of public safety. Indeed, that's the goal the Virginia General Assembly plainly had in mind when enacting VSOR, as it explained the registry's purpose: "to assist the efforts of law-enforcement agencies and others to protect their communities and families from repeat offenders and to protect children from becoming victims of criminal offenders by helping to prevent such individuals from being allowed to work directly with children." Va. Code § 9.1-900. This is a quintessential non-punitive goal. *Shaw*, 823 F.3d at 573–74; *Femedeer*, 227 F.3d at 1253.

52

Prynne does not plausibly allege that VSOR lacks a rational relationship to this goal. Contrary to Prynne's assertions, she has not plausibly alleged facts demonstrating that VSOR "actually *increases* recidivism." Opening Br. 21. At most, the complaint cites law review articles and studies suggesting that sex offender registries "*may* actually increase recidivism," J.A. 24 ¶ 117 (emphasis added), or "*may* well have increased (and almost certainly have not reduced) the frequency of sex crimes by convicted sex offenders," J.A. 24 ¶ 119 (emphasis added). These allegations include the inherently equivocal word "may," which is used to indicate possibility or probability. *See* May, Webster's New Int'l Dictionary (3d ed. 1961). Nor are any of these studies alleged to have looked at VSOR specifically, as the complaint broadly states that they examined sex offender registries "like Virginia's." J.A. 24–25, ¶¶ 117, 120. But even if a handful of studies question how effective a registry is in accomplishing its non-punitive objective, that does not render the system punitive.

The Supreme Court has reiterated that "[a] statute is not deemed punitive simply because it lacks a close or perfect fit with the nonpunitive aims it seeks to advance." *Smith*, 538 U.S. at 103. Instead, what is required is a reasonable relationship between the registry and the legislature's goals. *E.g.*, *Under Seal*, 795 F.3d at 266; *see also Bedesen*, 507 F.3d at 1006 ("Where there is such a rational connection to a nonpunitive purpose, it is not for the courts to second-guess the state legislature's policy decision as to which measures best effectuate that purpose."). Even if Prynne were correct that the legislature overestimated the registry's effect on public safety, that would in no way rebut the existence of a legitimate, non-punitive purpose in establishing it. *E.g.*, *Masto*, 670 F.3d at 1057; *Verniero*,

53

119 F.3d at 1098 (observing that allegations that "a more effective predictor might be devised . . . is not enough to make the objective purpose of the predictor adopted a punitive one"). An ineffective civil scheme is still civil in nature so long as the legislature's purpose and the registry's effect was not punitive.

At bottom, Prynne has not plausibly alleged that VSOR lacks a rational relationship to the non-punitive goal of public safety, so this "most significant" factor weighs against the existence of an Ex Post Facto Clause violation.

### 5. Not Excessive Compared to Non-Punitive Purpose

The last *Smith* factor is whether the registry is "excessive in relation to its [civil] regulatory purpose." 538 U.S. at 103. Contrary to Prynne's assertion, the excessiveness inquiry examines the State's choices in establishing VSOR as a whole and does not require it to justify Prynne's individual inclusion on the registry.

*Smith*—and the prior Supreme Court cases it cites—unequivocally recognize that "[t]he *Ex Post Facto* Clause does not preclude a State from making reasonable *categorical judgment* that conviction of specified crimes should entail particular regulatory consequences." *Id.* As the Court explained, "[d]oubtless, one who has violated the criminal law may thereafter reform and become in fact possessed of good moral character. *But the legislature has power in cases of this kind to make a rule of universal application*," including the "determination to legislate with respect to convicted sex offenders as a class, rather than require individual determination of their dangerousness." *Id.* at 104; *see Hawker*, 170 U.S. at 197 (upholding as non-punitive a law prohibiting the convicted felons from practicing medicine); *De Veau*, 363 U.S. at 160 (plurality opinion) (upholding as non-

54

punitive laws prohibiting convicted felons from serving as officers or agents of a union); *Masto*, 670 F.3d at 1057 ("Plaintiffs' argument that [the registry] is overbroad because it will force many non-dangerous offenders to register is squarely foreclosed by *Smith*."); *Miller*, 405 F.3d at 721 ("The absence of a particularized risk assessment . . . does not necessarily convert a regulatory law into a punitive measure[.]"). Applied here, that means that the Virginia legislature acted well within its authority to determine that individuals convicted of Va. Code § 18.2-370.1 should be classified as "Tier III" offenders and subject to VSOR's more stringent requirements.

Viewed through that lens, Prynne's allegations do not demonstrate that VSOR is excessive compared to the non-punitive goal of public safety. For example, Prynne contends that being subject to lifetime registration is inherently excessive. But the Alaska registry at issue in *Smith* entailed lifetime registration, and the Supreme Court undertook the same review discussed here without indicating that this fact affected the analysis. *See* 538 U.S. at 98; *see also W.B.H.*, 664 F.3d at 859 ("[In *Smith*], the Court found unpersuasive arguments that the Alaska law was excessive because of its reporting requirements (for life, in some instances) and the registry's wide dissemination (to the world via the internet)."). But even if a particular provision were deemed excessive when imposed for life in a particular case, that one-off aspect of the analysis tipping in her favor would not, as a matter of law, alter the analysis as a whole so as to satisfy Prynne's ultimate obligation.

Prynne's other arguments do not pass muster either. For example, she argues that in-person reporting is excessive because "the same information could be conveyed by mail or electronically." Opening Br. 23. But the Supreme Court in *Smith* plainly stated that the

55

inquiry is not "whether the legislature has made the best choice possible to address the problem it seeks to remedy," but whether the "regulatory means chosen are reasonable." 538 U.S. at 105 ("[The excessiveness inquiry] is not an exercise in determining whether the legislature has made the best choice possible to address the problem it seeks to remedy. The question is whether the regulatory means chosen are reasonable in light of the nonpunitive objective."). In-person reporting can be a reasonable choice and furthers the stated regulatory goals, as this Court and others have previously recognized. *E.g.*, *Under Seal*, 709 F.3d at 266; *Shaw*, 823 F.3d at 576.

Further, Prynne's allegation that VSOR is excessive because it prohibits entry on certain properties without exceptions "for attending church, going to vote, or performing one's job" ignores VSOR's plain language. Opening Br. 24. As discussed earlier, VSOR contains no such ban. Namely, it does not ban church attendance, it contains an exception for voting, and it provides a means for registrants to obtain a court order allowing permission to enter upon the requisite showing of good cause. These allegations simply misapprehend VSOR's text.

Prynne's remaining arguments mostly take issue with the legislature's contrary determinations about the relevance of certain information collected and disseminated to fulfill its purposes. Disagreement does not demonstrate excessiveness. *Smith*, 538 U.S. at 103 ("A statute is not deemed punitive simply because it lacks a close or perfect fit with the nonpunitive aims it seeks to advance. . . . [I]mprecision . . . does not suggest that the Act's nonpunitive purpose is a sham or mere pretext."). Further, VSOR requires registrants to submit a new set of fingerprints every 90 days. But VSOR allows registrants to obtain a

56

court order exempting them from that requirement, and Prynne's complaint indicates that she has an order to that effect. She therefore lacks standing to challenge VSOR's fingerprint "requirement because it imposes no additional burden on [*her*]." *Anderson*, 647 F.3d at 1172.

Lastly, Prynne contends the registry is excessive to its nonpunitive goals by reiterating that a few studies *suggest* that sex offenders are not as likely to reoffend as previously thought and that sex offender registries *may* not be as effective at reducing recidivism. As discussed, these studies do not cast doubt on the legislature's ability to conclude otherwise or indicate a punitive system despite intending to fashion a civil one. Put simply, she has not alleged that VSOR's provisions are so excessive compared to their regulatory purpose that this factor alone would transform VSOR as a whole into a punitive regime.

## II.

For the reasons stated above, none of Prynne's allegations—individually or collectively—provides a basis for overcoming the presumption that the Virginia General Assembly's stated civil purpose for enacting VSOR is actually punitive. As such, she has not plausibly alleged that VSOR violates the Ex Post Facto Clause, and the district court properly dismissed her complaint under Rule 12(b)(6) for failure to state a claim. I would therefore affirm the judgment of the district court and respectfully dissent in part.